UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Yahui Song, Ph.D.,                                                   Civil Action No. 11cv427 (ADM/TNL)

       Plaintiff,

v.

Regents of the University of Minnesota,
L. James Nixon, M.D., Barbara K. Patrick, M.D.,           **MEMORANDUM OF LAW**
Sheila M. Specker, M.D., Theodore R.
Thompson, M.D., Kathleen V. Watson, M.D.,
and John Does 1-15,

       Defendants.
_____

      Plaintiff moves the court for leave to amend her complaint, by adding Count XIII concerning the University's refusal to issue official transcripts at Plaintiff's request. Plaintiff also moves for a preliminary injunction directing the University to issue official transcripts at Plaintiff's request and to refrain from efforts to collect the debt at issue herein.

      **I.**     **Motion to Amend.**

      Attached hereto as Exhibit A is Plaintiff's proposed Second Amended Complaint, which includes proposed Count XIII relating to Defendant Regents' and Watson's holding and refusing to issue official transcripts for Plaintiff because of an alleged debt to the University. FRCP, Rule 15 (a)(2) provides that for amendments such as Plaintiff's proposed Second Amended Complaint, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." In *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962), the Supreme Court held:

> Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded. . . If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

Plaintiff's proposed Second Amended Complaint, in the new Count XII, and the declarations accompanying this motion set out the facts and law supporting Plaintiff's claim.

Regents is wrongfully "holding" Plaintiff's official transcript which she requires to apply to other medical schools and residency programs, under the guise of a debt owed to the University. The "debt" was not contracted for and Plaintiff owes no money to the University. Plaintiff borrowed money for the Fall term 2009 from the U.S. Department of Education ("DOE") through a of federal Direct Loans. Song Declaration ¶¶ 2-3. The loans were direct from the DOE to Plaintiff and deposited initially in her account with the University. The University took for itself Plaintiff's tuition and other charges and on August 12, 2009, paid the rest ($7,514.96) over to Plaintiff for living expenses for that term. Id. ¶4.

As the Amended Complaint alleges, and Dr. Song summarizes in her declaration filed herewith, the Medical School suspended Plaintiff on August 13, 2009, and took two months, until October 14, 2009, to issue a failing grade in Plaintiff's Summer term Neurology clinical course, which led to further suspension until her dismissal hearing. Song Decl. ¶ 6-7. At all times was enrolled and registered, but was prohibited by the Medical School from attending her clinical courses. Id. ¶ 5-6. On October 16, 2009, the school cancelled Plaintiff's registration for Fall term 2009 classes. And, Plaintiff never actually attended a Fall 2009 course. Id. at ¶¶ 7-8.

2

On October 16, 2009, the portion of Plaintiff's Direct Loan which had paid her tuition and school charges was returned or refunded to DOE leaving a balance unpaid of the Direct Loan of $7,549.96. the living expense portion of the loan. Song Decl. ¶9-10.

The trouble is that the University unilaterally, on October 16, 2009, paid or "refunded" to the DOE the portion of DOE's loan to Plaintiff that was paid directly over to Plaintiff for living expenses, $7,549.96. Id. ¶12-13. The University was not responsible to refund or repay this amount, according to the governing federal regulation, 34 C.F.R. 668.21(a)(2)(ii), which provides:

> (ii) For remaining amounts of FFEL or Direct Loan funds disbursed directly to the student for that payment period or period of enrollment, . . . the institution is not responsible for returning the funds, but must immediately notify the lender or the Secretary, as appropriate, when it becomes aware that the student will not or has not begun attendance so that the lender or Secretary will issue a final demand letter to the borrower in accordance with 34 CFR 682.412 or 34 CFR 685.211, as appropriate. . .

University's unilateral payment, unauthorized by Plaintiff, is the basis of the University's "hold" on Plaintiff's official transcript. Id. ¶ 14. Had University not injected itself in Plaintiff's loan relationship with DOE, and done what the regulations require, simply notify DOE of Plaintiff's non-attendance in the Fall 2009, Plaintiff would have been funneled into the DOE repayment scheme established by regulation after a six month grace period. 34 C.F.R. § 685.207 (b)(2)(i). The University was an interloper in Plaintiff's relationship with the Department of Education. The regulation required only that the University notify the DOE so that the Department could issue a demand letter to Plaintiff and Plaintiff could start dealing with the DOE concerning her debt. The regulations provide for several payment plans, standard, extended, graduated, income contingent plan and income-based repayment plan. See, 34 C.F.R. § 685.208 - .209. The payment plan is the borrower's choice. 34 C.F.R. § 685.210. The

3

regulations also allow for postponement of payments through deferral and forbearance procedures, which permit a former student from defaulting on a loan. 34 C.F.R. § 685.204 and .205.

Furthermore, the official transcript hold is contrary to the University's Administrative Policy entitled "Withholding Diplomas and Official Transcripts from Students." The University is not supposed to hold official transcripts on debts that have not handled by collections, according to the policy, and Plaintiff's alleged debt has not been referred for collection, according to counsel's letter. See, Declaration of Richard T. Wylie, Exhibits A and B.

Finally, the transcript hold is contrary to the American Association of Medical Colleges rule that holds can only be related to financial obligations related to the information on the transcript. There should be no information on the transcript about Fall 2009. Plaintiff's last course was Neurology in Summer 2009. Song Decl. ¶16.

Plaintiff alleges in her proposed amendment that University is displaying retaliatory animus in continuing to hold Plaintiff's official transcript. The original transcript hold in 2009 was based on a debt that Plaintiff did not incur. So, discrimination and/or reprisal are certainly a likely cause. If the 2009 hold was only the product of inattention or mistake or a clerk's overactive trigger finger, the University's continued refusal to issue a transcript smacks of reprisal of its opponent in this civil rights case.

Thus, because Plaintiff has shown "underlying facts or circumstances . . . . [that] may be a proper subject of relief, [s]he ought to be afforded an opportunity to test [her] claim on the merits." *Foman*, supra. Plaintiff's proposed amendment should be allowed.

## II.     MOTION FOR PRELIMINARY INJUNCTION.

In *Dataphase Systems, Inc., v. C L Systems, Inc*, 640 F.2d 109, 112-114 (8th Cir. 1983), the Eighth Circuit Court of Appeals discussed the factors to consider on whether to grant a preliminary injuction. The Court described the "traditional test" which stated the four factors as:

> . . . (1) whether there is a substantial probability movant will succeed at trial; (2) whether the moving party will suffer irreparable injury absent the injunction; (3) the harm to other interested parties if the relief is granted; and (4) the effect on the public interest. This statement of the standard, in particular the requirements of "substantial probability" and "irreparable injury," has become known as the "traditional test."

*Id*. at 112. The Court of Appeals then acknowledged a different test, sometimes referred to as an "alternate test," stated in *Fennell v. Butler*, 570 F.2d 263, in which the Court suggested that a preliminary injunction should issue:

> upon a clear showing of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *Id*. at 264.

The *Dataphase* court rationalized the two tests by rejecting a "wooden application" of the probability of success factor in the traditional test, and held that "The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case. Thus, an effort to apply the probability language to all cases with mathematical precision is misplaced.   640 F2d. at 113.  The Court elaborated:

> In balancing the equities no single factor is determinative. The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.

> It follows that the court ordinarily is not required at an early stage to draw the fine line between a mathematical probability and a substantial possibility of success. This endeavor may, of course, be necessary in some circumstances when the balance of

5

equities may come to require a more careful evaluation of the merits. But where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation. *Id*.at 113.

*****

In sum, whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. *Id*. at 114.

However, as shown above no one factor is determinative.

On Plaintiff's motion for a preliminary injunction requiring the University to issue official transcripts for Plaintiff, the equities clearly favor issuance of the injunction:

1. **Threat of irreparable harm to Plaintiff**. If Plaintiff does not receive official transcripts, she cannot apply to other medical schools or residency programs. Declaration of Yahui Song, ¶ 16. Each month and year that passes without access to an official transcript forecloses Plaintiff's ability to apply to other medical schools to finish her U.S. medical degree. Id. Plaintiff wishes to attempt to mitigate the incredible harm caused by her dismissal from Defendants' medical school. While monetary damages may approximate Plaintiff's lost income from delay in her medical education, damages are less than adequate to compensate for that delay at the end of her medical career.

2. **Balance of harm to Plaintiff and injury to defendants if Plaintiff's motion is granted**. There is clearly no harm to the University if it must issue official transcripts for Plaintiff. Losing the leverage of withholding Plaintiff's official transcript hostage with a debt Plaintiff does not owe it is no injury at all.

3. **Probability that Plaintiff will succeed on the merits**.

   As Plaintiff points out above in support of her motion to amend, the

applicable federal regulations specifically provide that the University was not obligated to pay back to the Department of Education loan proceeds that it had refunded to Plaintiff. 34 C.F.R. 668.21(a)(2)(ii). The regulations also provide that when a student ceases to be enrolled on at least a half-time basis, a six-month grace period begins. 34 C.F.R. § 685.207 (b)(2)(i). The University was an interloper in Plaintiff's relationship with the Department of Education. The regulation required only that the University notify the DOE so that the Department could issue a demand letter to Plaintiff and Plaintiff could start dealing with the DOE concerning her debt. The regulations provide for several payment plans from which the borrower may choose (34 C.F.R. § 685.208 .210), and opportunities to postpone payment and remain out of default (34 C.F.R. § 685.204 and .205.) The University is attempting to impose on Plaintiff a greater obligation and sanction than the DOE on the living expense portion of the 2009 Fall term Direct Loan by hijacking the obligation.

Moreover, the University's own Administrative Policies limit it from holding official transcripts. In order to hold a transcript, the student must have "financial obligations" of more than $100. The University policy defines a "financial obligation" as over "a minimum of $100 to the University **handled by the University collections offices on respective campuses**." Wylie Declaration, Ex. A. Plaintiff's alleged debt to the University has not been referred for collections. Wylie Declaration Ex. B.

Finally, the American Association of Medical Colleges, of which

University is a member, requires that member medical schools not withhold academic transcripts because of financial obligations unrelated to the information on the transcript. Song Declaration, Ex. E, at ¶ 13.d. Plaintiff's transcript can only reflect her performance through the end of the Summer 2009 term; and the pretended debt claimed by the University is clearly for the Fall 2009 term. Therefore, the AAMC requirement mitigates in Plaintiff's favor. Id. ¶ 16 and Ex. F and G.

The University cannot withhold Plaintiff's transcript under these circumstances. Thus, it appears that Plaintiff has a good chance of succeeding on her claim.

4. **The public interest**. The competing public interests involved here are that the University be paid legitimate claims on the one hand, but that a person who has invest hundreds of thousands of dollars to obtain a medical education not be unfairly hamstrung in her effort to complete her education because of an illegal, and either mistaken or mean-spirited, accounting action.

On Plaintiff's motion for a preliminary injunction restraining the University from attempting to collect the alleged account, the equities also favor Plaintiff.

1. **Threat of irreparable harm to Plaintiff**. If Plaintiff is made subjection to collection efforts on a debt that she did not incur with the University, which she cannot pay off under the terms of her other federal Direct Loans, Plaintiff will face financial catastrophe. She will be unable to apply to other medical schools. Further, the University should not be permitted to refer the questionable alleged debt for collection in an effort to shore up the legitimacy of its specious transcript hold.

2. **Balance of harm to Plaintiff and injury to defendants if Plaintiff's motion is granted**.  No or little appreciable harm will befall the University.  It has waited two years without placing its unlikely claim for collection.

3. **Probability that Plaintiff will succeed on the merits**.  See above.

4. **The public interest.**  See above.  There appears to be little public impact in preventing more active mischief by the University after two years of sitting on its hands.  The public's interest, generally, is served by equity and fairness.

## CONCLUSION

For the foregoing reasons, Plaintiff's motions to file a Second Amended Complaint and for a Preliminary Injunction should be granted.

Dated: September 9, 2011.   /s Richard T. Wylie _____
Richard T. Wylie - ID #11912X
701 Fourth Avenue South, Suite 500
Minneapolis, MN  55415
612/337-9581
**ATTORNEY FOR PLAINTIFF**